RESOLUTION TRUST CORPORATION, in its capacity as Conservator for Midwest Savings Association, a federal association, Plaintiff,

v.

FORD MALL ASSOCIATES LIMITED PARTNERSHIP; a Minnesota limited partnership; Haskell's Inc., a Minnesota corporation; Milton Cohen; Joseph Weis; Specialty Sales Service, Inc.; Julius B. Nelson & Son, Inc.; St. Paul Linoleum & Carpet Co., Inc.; Minnesota Mechanical, Inc.; Seal–Treat, Inc.; Wheeler Hardware Company; Jesco, Inc.; J.P. Albert Co., Inc.; Nichols & Hines, Inc.; Ron's Cabinets, Inc.; Gateway Glass Co.; Pope Associates, Inc.; Yale Incorporated; Stewart Lumber Company; Specialty Systems, Inc.; Grazzini Brothers & Company; Industrial Sprinkler Corporation; Curran V. Nielsen Company, Inc.; Minnesota Fence & Iron Works, Inc.; Weber Electric, Inc.; Weis Builders, Inc.; Wilfred S. Gall d/b/a Willie's Dumpster Service; Minuti–Ogle Co., Inc.; Spancrete Midwest Company; Western Steel Erection, Inc.; Glenn Rehbein Excavating, Inc., Defendants,

and

Weis Builders, Inc., Intervener.

WEIS BUILDERS, INC., Plaintiff,

v.

FORD MALL ASSOCIATES LIMITED PARTNERSHIP; Milton J. Cohen; Joseph C. Weis; Resolution Trust Corporation, in its capacity as Conservator for Midwest Savings Association, a federal association; Minuti–Ogle Com., Inc.; Jesco, Inc.; Yale, Inc.; Gateway Glass Co.; Weber Electric, Inc.; Industrial Sprinkler Corporation; Pope Associates, Inc.; St. Paul Linoleum & Carpet Co., Inc.; Seal–Treat, Inc.; Wheeler Hardware Company; Ron's Cabinets, Inc.; Stewart Lumber Company; Nichols & Hines, Inc.; Grazzini Brothers & Company; Specialty Systems, Inc.; Julius B. Nelson & Son, Inc.; Norwest Bank Minneapolis, National Association; The Roseville Bank; and Haskell's Inc., Defendants,

and

SPANCRETE MIDWEST COMPANY,
Intervener,

v.

RESOLUTION TRUST CORPORATION,
in its capacity as Conservator for Midwest Savings Association, a federal association, Defendant and Third Party Plaintiff,

v.

LAWYERS TITLE INSURANCE CORPORATION and Metro Title Corporation,
Third–Party Defendants.

Civ. No. 4–89–971.

United States District Court,
D. Minnesota,
Fourth Division.

March 27, 1991.

See also 796 F.Supp. 1233.

Elmer Bernard Trousdale, Oppenheimer Wolff & Donnelly, St Paul, MN, Madge S. Thorsen, Mary E. Senkus, Patrick M. McLaughlin, Linda J. Soranno, Oppenheimer Wolff & Donnelly, Minneapolis, MN, Ferdinand F. Peters, F.D.I.C. Legal Div., Burnsville, MN, for Resolution Trust Corp.

Alfred H. Edwall, Jr., Robins Kaplan Miller & Ciresi, Minneapolis, MN, for Ford Mall Associates Ltd. Partnership and Joseph C. Weis.

Milton Cohen, pro se.

Joseph F. Grabowski, Grabowski Law Office, Plymouth, MN, for Specialty Sales Service, Inc.

Peter C. Halls, Faegre & Benson, Minneapolis, MN, for Julius B. Nelson & Son, Inc.

Philip T. Colton, Maun & Simon, Minneapolis, MN, for St. Paul Linoleum & Carpet Co., Inc.

Michael D. Quayle, Green Merrigan Johnson & Quayle, Minneapolis, MN, for Minnesota Mechanical, Inc.

Thomas J. Williams, Miller & Williams, Minneapolis, MN, for Seal–Treat Inc.

Alan Kenneth Ruvelson, Jr., Ruvelson Kautzer & Schmidt, St. Paul, MN, for Wheeler Hardware Co.

William Dennis Hull, Coleman Hull & Van Vliet, Minneapolis, MN, for Jesco Inc.

J.P. Albert Co. Inc., Jack Mertes, pro se.

John M. Koneck, Ronda P. Bayer, Fredrikson & Byron, Minneapolis, MN, for Nichols & Hines Inc.

David Joseph Meyers, Rinke & Noonan, St. Cloud, MN, for Ron's Cabinets Inc.

Michael John Minenko, Michael D. Madigan, Johnson & Madigan, Minneapolis, MN, for Gateway Glass Co.

James Eric Lindell, Minneapolis, MN, for Pope Associates Inc.

James Kenneth Sander, Wagner Johnston & Falconer, Minneapolis, MN, for Yale Inc.

John Gilbert Gisselquist, Gisselquist Law Office, St. Paul, MN, for Stewart Lumber Co.

Harold Julian Slawik, III, Slawik Law Office, St. Paul, MN, for Grazzini Bros. & Co.

John Gerard Patterson, Timothy Charles Cook, Moore Costello & Hart, St. Paul, MN, for Industrial Sprinkler.

Peter W. Johnson, Johnson & Wood, Wayzata, MN, for Curran V. Nielsen Co., Inc.

Andrew J. Eisenzimmer, John C. Gunderson, Meier Kennedy & Quinn, St. Paul, MN, for Minnesota Fence & Iron Works, Inc.

Todd Stedtfeld, Stedtfeld Law Office, River Falls, WI, Bruce Lennart Beck, Galena & Beck, St. Paul, MN, for Weber Elec. Inc.

Jeffrey Allen Hanson, Paul William Bucher, Ken Douglas Schueler, Dunlap Finseth Berndt & Sandberg, Rochester, MN, for Weis Builders Inc.

Allen E. Christy, Jr., Hadlick Hoedeman & Christy, Minneapolis, MN, for Wilfred S. Gall, dba Willie's Dumpster Service.

Jack D. Elmquist, Thomas Suprenant, Elmquist Law Office, Minneapolis, MN, for Minuti–Ogle Co. Inc.

James Todd Swenson, MacKall Crounse & Moore, Minneapolis, MN, for Spancrete Midwest Co.

Robert P. Laue, Snelling Christensen & Briant, Minneapolis, MN, for Western Steel Erection, Inc.

Jeffrey L. Knutson, Glenn Rehbein Excavating, Inc., Lino Lakes, MN, for Glenn Rehbein Excavating, Inc.

Gary Alan Heck, Faegre & Benson, Minneapolis, MN, for Norwest Bank Minneapolis, National Ass'n.

Joseph Michael Paiement, Paul D. Dove, Arnold & McDowell, Minneapolis, MN, for Roseville Bank.

Paul Laurin Ratelle, Priscilla McNulty, Fabyanske Svoboda Westra Davis & Hart, Gerald G. Workinger, Jr., Workinger Law Office, Minneapolis, for Lawyers Title Ins. Corp.

Chad D. Lemmons, Woodbury, MN, for Metro Title Corp.

James Kenneth Sander, Wagner Johnston & Falconer, Minneapolis, MN, for Mechanic's Lien Coordinator, on behalf of all mechanic's lien claimants.

## ORDER

DOTY, District Judge.

This matter is before the court on the following motions:

1. Lawyers Title Insurance Corporation's ("LTIC") motion for summary judgment regarding the claims asserted by Resolution Trust Corporation ("RTC") on behalf of Midwest Savings Association (MWF) in its amended third-party complaint against LTIC;

2. Weis Builders, Inc.'s ("Weis Builders") motion for partial summary judgment on the issue of what constitutes the first visible improvement to the Ford property;

3. The mechanics' lien coordinator's ("coordinator") motion for partial summary judgment:

    a. That the coordinate liens of the mechanic's lien claimants attached prior to the recording of the MWF mortgage on the Ford Mall;

    b. That the MWF mortgage sign posted on the Ford Mall site prior to the recording of the mortgage does not constitute actual notice of MWF's mortgage; and

    c. That all valid mechanic's lien claims against the Ford Mall property are prior to MWF's mortgage.

4. MWF's motions for summary judgment concerning its claims against Milton J. Cohen in the foreclosure action and to dismiss the defenses raised by Cohen; and

5. MWF's motion for entry of judgment according to the terms of the stipulation by and between MWF and defendants Ford Mall Associates Limited Partnership ("FMALP") and Joseph Weis ("Weis"). Based on a review of the file, record, and proceedings herein, the court grants MWF's

motion to dismiss Milton J. Cohen's defenses and denies all other motions.

## BACKGROUND

This case involves various disputes arising out of the renovation and new construction of the Ford Mall project. Defendant Ford Mall Associates Limited Partnership ("FMALP") was a partnership between general partners Milton Cohen, a St. Paul businessman, and Joseph Weis, owner and operator of Weis Builders, a general contractor. FMALP was formed to develop the Ford Mall complex in Highland Park. Beginning in the fall of 1986, FMALP sought financing to remodel an existing Ford Mall building and to construct a new retail shopping mall, office building, and parking ramp at the Ford Mall complex. Weis and Cohen, the general partners of FMALP, sought financing from MWF Mortgage Corporation, a wholly owned subsidiary of Midwest Federal Savings and Loan.[1] On December 4, 1986, they obtained a commitment from MWF for a construction loan in the amount of $8,625,000.

Weis and Cohen, on behalf of FMALP, executed a construction loan agreement, a promissory note in the original principal amount of $8,625,000, a mortgage and security agreement and fixture financing statement ("mortgage") and an assignment of rents and leases ("assignment"). In addition, Weis and Cohen executed personal guaranties which provided that they absolutely and unconditionally agreed to be jointly and severally liable for the obligations of FMALP under the terms of the note.

Joseph Weis made it a condition of the financing that his company, Weis Builders, would act as the general contractors of the Ford Mall project. MWF also required as part of the financing that the borrowers furnish appropriate title insurance. The borrowers chose to use Metro Title Corporation ("Metro"), a long-time agent for third-party defendant Lawyers Title Insurance Corporation ("LTIC"). Metro, by accepting MWF's letter of instruction, agreed to protect the priority of MWF's mortgage by recording the mortgage and issuing a policy insuring against past or future mechanics' liens.[2] LTIC required its agents in Minnesota to inspect for the first visible commencement of work on any property on which the company agreed to write mechanics' lien coverage. Thus, Metro visited the Ford Mall site sometime between December 19 and December 26, 1986, confirming at least to its satisfaction that no work had begun at the site. Cohen also assured Metro that no work had begun.

At the closing, one of the issues that arose concerned the survey exception to the title commitment.[3] MWF requested that LTIC insure against all matters that would be disclosed by an accurate survey. As a matter of policy, LTIC will agree to delete the survey exception and insure against such matters only if it actually receives an adequate survey. At the closing, Metro's Robert Seng ("Seng"), the closer and title examiner, requested a survey update in order to comply

---

1. Midwest Federal was placed under the Federal Savings & Loan Insurance Corporation (FSLIC) conservatorship in February 1989. On May 4, 1989, all of Midwest Federal's assets were sold and transferred to a new federal association named Midwest Savings Association ("MSA"). Among those assets transferred were the assets of MWF. On July 13, 1989, MSA as sole shareholder of MWF approved a plan of complete liquidation and voluntary dissolution of MWF. On August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") abolished the FSLIC for purposes of winding up thrifts and conservatorship and receivership, and FSLIC was then replaced with RTC. RTC now asserts MSA's claims in its capacity as conservator. For purposes of these motions, RTC and MWF will be collectively referred to as MWF.

2. The instruction letter set out the terms of the policy that MWF requested and the title company agreed to furnish. The parties to a title insurance policy typically negotiate what coverage exceptions will be permitted or deleted because title policies normally contain standard exceptions to coverage which an insured may nonetheless want covered. In the present case, the letter agreement specifies that the title policy would contain only certain agreed upon exceptions, as listed, and Metro was otherwise bound to insure that the title was free and clear and MWF was protected against mechanics' liens "heretofore or hereafter."

3. The title commitment is the title company's preliminary agreement to insure and it sets out the general exceptions to coverage which will ultimately appear in the final title policy unless otherwise agreed.

with MWF's request to eliminate the survey exception in the policy. Cohen was responsible for ordering the survey, which was done on December 24, 1986. At that time Sunde Land Surveying, Inc. ("Sunde") placed markers on the site including various in-ground monuments, nails, paint and two wooden survey stakes. It is undisputed that this survey was related solely to the financing of the Ford Mall project.

The mortgage was executed on December 29, 1986. The first of the loan proceeds was disbursed on December 29, 1986. Metro also agreed to act as disbursing agent for the proceeds of the construction loan. LTIC generally insisted on this procedure because it ensured that the title company could control the funds and could also control various other risks by discontinuing disbursements if trouble occurred. As disbursing agent Metro received draw requests from FMALP and Weis Builders that revealed the exact status of the project. Metro reviewed every draw request line by line to determine how many line items were being allocated and reallocated and whether any problems existed. Thus it could determine to its own satisfaction whether the loan was in balance or the project in trouble. Under the disbursing agreement, Metro was entitled to stop disbursements if it became concerned about the project's status, subject only to a specific overriding instruction by the lender.

Under LTIC's rules and practices, a title policy cannot be issued unless and until a mortgage is recorded. Recording was to be done as soon as possible after a closing. Metro's initial intent was to record the mortgage documents on December 29, 1986. The mortgage documents, however, remained on Seng's desk for over six months. In July 1987, Seng was asked to take a leave from Metro and the mortgage documents were discovered by other Metro employees who then recorded them with the County Recorder on July 6, 1987 and with the Registrar of Titles on July 22, 1987.

Metro did not inform MWF about the late recording of the mortgage documents. Rather, Seng told MWF's loan administrator that the mortgage had already been recorded. Weis and Cohen, however, knew about the late recording because in July 1987, Metro sought their help to correct certain documents so that the mortgage could be recorded in torrens.

Weis Builders began work on the Ford Mall site in April 1987. In June 1987 construction was stopped by a temporary restraining order obtained by a tenant against FMALP. That dispute was resolved in October 1987 and construction began again. The project, however, was shut down again in November 1987 by a second tenant lawsuit. The second delay lasted until April 1988, when the second lawsuit was settled. Loan proceeds were used to settle both lawsuits with the knowledge of all parties: MWF, FMALP, Weis, Cohen, Weis Builders and Metro. Settling the second suit required $640,000 of loan proceeds, causing concern about the status of the construction loan.

As a result of the lawsuits and delays, the borrowers requested additional funds for the project. In April 1988, Weis approached an MWF employee, A.W. Davis, Jr. ("Davis"), seeking an increase in the loan amount. Davis indicated that MWF would need a new project appraisal which justified any proposed increase. No increase, however, was ever granted, and in November 1988, the borrowers were advised by letter that no increase would be forthcoming. Moreover, no written agreement was ever executed committing MWF to any funding increase and there is no evidence of such in MWF's records.

In late 1988, MWF's concerns about the loan status began to increase. By the end of September 1988, interest reserves had been exhausted with no new financing or other solution available to solve the financing problems. In October 1988, Ford Mall began missing monthly interest payments due pursuant to the mortgage agreement. FMALP also failed to pay real estate taxes and assessments due in 1988. Moreover, the loan was out of balance as defined by the construction loan agreement. The borrowers and MWF met on various occasions to discuss the problems and to give FMALP the opportunity to resolve them.

In November 1988, MWF informed the borrowers that it would not continue to disburse funds unless additional equity and leases were found. MWF indicated that it would continue to review requested draws to give the borrowers every chance to continue the project. The borrowers, however, made no progress. MWF's last funding occurred in December 1988 for a draw reflecting October work. In January 1989, MWF formally declared the loan in default and accelerated the loan. At that time, approximately $6,139,165 of loan proceeds had been either disbursed or credited. Ford Mall failed to pay the sums due upon MWF's acceleration demand. In March 1989, MWF began foreclosure proceedings against the property. During this entire period of time MWF believed that its mortgage was the first lien on the property.

During the period of April 7, 1987 through March 15, 1989, Weis Builders and its subcontractors performed labor and furnished skill, material and machinery to the Ford project in the amount of $4,012,903.45. Weis Builders has been paid $2,427,456.66 leaving an unpaid balance of $1,585,446.79. Within 120 days after furnishing the last item for the project, Weis Builders filed a verified mechanic's lien statement.

As a result of the foregoing, the parties bring various motions before the court. The mortgagee, MWF, claims that the borrower, FMALP, defaulted on the construction loan secured by the mortgage. The general contractor, Weis Builders, Inc. claims that it was fraudulently induced to continue construction by promises of continued and increased funding after the loan was declared in default on November 8, 1988. The subcontractors and suppliers assert mechanics' liens which are primarily for labor or materials supplied to the project after the loan was declared in default. The lien claimants alleged that their liens have priority over the mortgage because the first actual and visible improvement on the project occurred before the mortgage was recorded in July 1987.

MWF asserts third-party claims in the lien foreclosure action against Metro Title Corporation ("Metro"), which issued the title insurance and Lawyers Title Insurance Corporation ("LTIC"), which underwrote the policy.

MWF brings a contract claim alleging that LTIC wrongfully rejected coverage under its title insurance policy, and a negligence claim alleging that even if the mechanics' liens were not covered under the policy, that Metro's six month delay in filing the mortgage negligently resulted in the subordination of the mortgage to the mechanics' liens. MWF also alleges that Metro was LTIC's agent for purposes of recording the mortgage.

LTIC seeks summary judgment on all of MWF's claims. In response to MWF's contract claim, LTIC contends that by failing to satisfy outstanding claims for labor and materials out of undisbursed, committed funds, MWF created or suffered the resulting mechanics' liens. Consequently, LTIC argues that the liens are expressly excluded from coverage under the title insurance policy and that LTIC is entitled to summary judgment on that claim.

LTIC also contends that summary judgment should be granted on MWF's negligence claim. LTIC contends that it had no duty to record the mortgage documents any earlier than it actually did. LTIC also contends that the priority of the mechanics' liens dates back to at least December 24, 1986, when the perimeter was staked during the survey done at its request, and thus any delay in recording the mortgage is irrelevant to the question of priority. LTIC therefore argues that MWF has suffered no damages caused by any delay in recording the mortgage documents. The background of each motion will be examined in turn.

### 1. LTIC's Motion for Summary Judgment

#### A. LTIC's Motion for Summary Judgment on MWF's Contract Claim

Under the title insurance policy issued by LTIC, the insuring provision states that:

Subject to the exclusions from coverage [LTIC] insures, as of [July 23, 1987] against loss or damage by reason of:

7. Any statutory lien for labor and material which now has gained or hereafter may gain a priority over the lien of the insured mortgage

.     .     .     .     .

LTIC concedes for purposes of this motion that the mechanics' liens fall within the terms of this insuring provision. LTIC contends that the liens are nonetheless excluded in the title insurance policy, under exclusion 3(a), which reads as follows:

> Exclusions from Coverage: The following matters are expressly excluded from the coverage of this policy:
>
> . . . . .
>
> 3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant . . .

LTIC argues that exclusion 3(a) precludes coverage of the mechanics' liens because MWF "created" or "suffered" the lien claims by refusing to disburse available loan proceeds. LTIC contends that when MWF began its action to foreclose the mortgage it owed a total of $1,585,449, approximately $1,000,000 less than the total amount of the undisbursed proceeds of $2,485,835. LTIC argues that because MWF failed to disburse these available funds it created or suffered the liens and thus LTIC is not obligated to pay them.

LTIC further argues that MWF created or suffered the mechanics' liens by knowingly allowing work to continue after the project was in trouble despite MWF's ability to prevent the continued work and the resulting lien claims. LTIC contends that MWF's failure to disburse all available funds to satisfy outstanding claims for unpaid labor and materials caused the filing of the mechanics' liens. Moreover, LTIC contends that MWF encouraged and induced the continuation of construction while refusing to disburse available funds, further evidence that MWF created or suffered the mechanics' liens.

MWF, however, contends that exclusionary clause 3(a) does not exclude the mechanics' liens in the present case. MWF characterizes this inquiry as a two-part question: (1) did MWF intend to create or suffer any liens, and (2) did MWF intend to create or suffer any liens to become *superior* to its own, which it argues is the actual risk covered by the title insurance policy. In answer to the first question, MWF argues that it did not create or suffer the mechanics' liens because there is no evidence that MWF acted with the intent to create or suffer any liens on the Ford Mall property.

MWF further argues that the creation or sufferance of liens lies in the hands of the borrower or contractor. MWF thus contends that FMALP and Weis Builders, acting with completed identity of interests, created or suffered the mechanics' liens because they had the power to prevent continued work on the project and made a deliberate decision to continue the work, knowing that financing problems existed. FMALP and Weis Builders also entirely controlled what information reached the subcontractors, and they elected to remain silent about the financing problems on the project. MWF thus contends that Weis Builders and FMALP were the creators of the mechanics' liens.

In answer to the second question, MWF argues that it did not intend to create any liens that were *superior* to its mortgage. MWF contends that LTIC controlled the priority risk. To support this contention, MWF notes that LTIC conducted a property inspection and initially concluded that mortgage priority was secured; LTIC ordered a boundary survey that was conducted on December 24, 1986; LTIC failed to record the mortgage in a timely manner; LTIC later acknowledged to the borrowers, but not to MWF, that it had agreed to insure an early start; [4] and LTIC also sought indemnity from the borrowers against the mechanics' liens. Thus, MWF argues that LTIC knowingly created and chose to assume the risk of superior liens. As a result of the foregoing,

---

**4.** If work has already begun on a project, the title company must decide if it is nonetheless willing to guarantee priority. Such coverage is known as "early start" coverage, meaning that the insurer, fully aware that lien rights may have already been created, nevertheless agrees to indemnify the insured against any losses it may suffer as a result of the prior liens. A title company that agrees to cover an early start will normally protect itself against financial exposure by insisting on disbursing the loan proceeds in order to monitor the project, to ensure that the proper parties get paid and to remain fully informed on the condition of the financing and the progress on the project.

MWF thus claims that the mechanics liens are not excluded by clause 3(a) in the title insurance policy and that LTIC is obligated under the title insurance policy to coverage such liens.

## B. LTIC's Motion for Summary Judgment on MWF's Negligence Claim

LTIC also seeks summary judgment on MWF's negligence claim. LTIC argues that its duty is defined solely by the terms of two agreements: the construction loan agreement dated December 29, 1986, between FMALP and MWF, and the letter agreement dated December 24, 1986, between Metro and MWF.[5] According to the provisions of those documents LTIC contends that it had a duty to either (a) withhold disbursement of the loan proceeds until the mortgage was recorded or (b) to issue a policy of title insurance that insured the gap between the time that the loan proceeds were paid and the time when the mortgage documents were actually recorded. It is undisputed that the loan proceeds were disbursed prior to the recording of the mortgage documents. LTIC contends that it nonetheless fulfilled its obligations because the title insurance policy insured the gap between the time of disbursement and recording. Thus, LTIC argues that neither Metro nor LTIC had a duty to record the mortgage documents prior to the effective date of the title insurance policy.[6] LTIC further contends that the construction loan agreement and the letter agreement supply the sole source of any duty regarding the time when the mortgage documents should have been recorded. LTIC argues that because it has satisfied this contractual duty by insuring the gap that MWF has no independent cause of action for negligence.

LTIC argues that even if the late recording of the mortgage was negligent, the recording date was not the proximate cause of the mortgage subordination. LTIC claims that the mortgage was already subordinate to the mechanics' liens because visible staking occurred during the survey conducted by Sunde Surveyors on December 24, 1986, prior to the mortgage execution on December 29, 1986. LTIC further argues that MWF had actual knowledge of this staking because it was done at MWF's request.[7] Thus, LTIC claims that the recording of the mortgage in July 1987 did not proximately cause the subordination of MWF's mortgage.

MWF contends that LTIC owed three separate but interrelated obligations to MWF: to record the mortgage, to disburse the funds and to insure against risks covered by the title insurance policy. MWF agrees that if LTIC chose to disburse the funds first and then record the mortgage later that LTIC was bound to insure the gap in time between the disbursing and recording. MWF argues, however, that the letter agreement does not eliminate all other obligations of LTIC. It contends that LTIC was required both to insure and to record and that LTIC was not free to handle the recording of the mortgage carelessly because LTIC had a common law duty to exercise the care and prudence normally required of parties that are engaged in the business of title insurance. Thus if LTIC's conduct harmed MWF as a result of the late recording MWF contends that LTIC should be liable in negligence for that harm.

MWF further contends that LTIC's late recording proximately caused MWF's loss of priority. MWF argues that the December 24, 1986, survey does not constitute the first visible sign of improvement on the property for purposes of establishing the priority of the mechanics' liens over MWF's mortgage. MWF contends that the first visible signs of improvement for purposes of mechanics' lien priority did not occur until the spring of 1987. Thus, LTIC's recording of the mortgage in July 1987 was the proximate cause of MWF's loss of mortgage priority. MWF further argues that if the first visible improvements did occur prior to the execution

---

5. For the purposes of this motion only, LTIC will concede that Metro was LTIC's agent for purposes of recording the mortgage documents.

6. The title insurance policy was ultimately issued on July 23, 1987.

7. MWF, however, contends that Metro's Robert Seng, the closer and the title examiner, requested this survey in order to comply with MWF's request to eliminate the survey exception in the title insurance policy.

of the mortgage, then LTIC should be estopped from raising this as a defense to MWF's claim and should remain liable for the consequences of its own negligence.

## 2. Weis Builders' Motion for Partial Summary Judgment

Weis Builders moves for partial summary judgment on the priority of its mechanic's lien.[8] Weis Builders contends that prior to the execution of MWF's mortgage on December 29, 1986, survey and engineering services had been performed at the Ford Mall site. It is undisputed that Sunde Land Surveying, Inc. ("Sunde") performed surveys on January 12, 1984, sometime in August 1984, April 15, 1986, and December 24, 1986. Weis Builders contends that those surveys constitute the first visible improvements for purposes of the Minnesota mechanic's lien statute and they predated the mortgage. Thus the mechanics' liens have priority over MWF's mortgage. The mechanics' lien coordinator also seeks partial summary judgment on this issue on behalf of all the mechanics' lien claimants except Nichols & Heins and Weis Builders.[9] Weis Builders and the mechanics' lien coordinator also argue that Sunde visibly staked the Ford Mall property on numerous occasions prior to the execution of the mortgage and that this staking was visible as a matter of law.

MWF contends, however, that the survey and staking performed by Sunde do not constitute the first actual and visible improvement within the meaning of the priority statute. MWF first argues that any such staking must be fundamental to the actual construction project to constitute the first visible improvement for purposes of priority. MWF claims that the surveys performed by Sunde bore no relationship to the actual construction of the project because the Ford Mall project was not in place until December 1986. To support this contention, MWF notes that the Ford Mall Associates Limited Partner-

ship was not formed until December 17, 1986; Cohen acquired the Ford Mall land on December 24, 1986; and the contract between the owner and the contractor (Weis Builders) was not signed until December 15, 1986. MWF thus reasons that the three surveys done prior to this time could not relate to the Ford Mall project and thus may not be used to establish priority of the mechanics' liens. MWF also argues that the fourth survey, conducted on December 24, 1986, was not fundamental to the actual construction of the Ford Mall project because that survey related solely to MWF's mortgage and the title insurance. The fourth survey thus may not be used to establish mechanics' lien priority.

MWF further contends that the Minnesota priority statute explicitly requires that any staking must be visible to constitute the first actual and visible improvement of the property. MWF contends that visibility at the time of the mortgage closing is a question of fact which is presently unresolved. MWF notes that no proof of visibility is offered for the first three surveys relied on by Weis Builders and the mechanics' lien coordinator in their motions for partial summary judgment. MWF further notes that the fourth survey, performed on December 24, 1986, involved marking the four boundary corners of the site. The surveyor testified that only two of the corners were marked by wooden stakes while the other corners were marked by iron monuments (pounded flush with the ground), nails and painted X's. MWF argues that two wooden stakes are not sufficient to constitute visible improvement as a matter of law and thus summary judgment is not appropriate on the question of priority of the mechanics' liens.

MWF further argues that it is an unresolved question of Minnesota law whether the 1974 amendment or the 1987 amendment to the priority statute controls this dispute. The 1987 version of the Minnesota priority statute specifically provides that visible stak-

---

**8.** Weis Builders initially sought summary judgment against FMALP and its general partners, Milton Cohen and Joseph Weis, but subsequently withdrew that motion.

**9.** As noted above, LTIC also seeks summary judgment on the issue of priority, but bases its argu-

ment solely on the survey conducted on December 24, 1986. LTIC contends that this survey was the first visible sign of improvement and thus LTIC's late recording of MWF's mortgage was not the proximate cause of MWF's loss of priority.

ing, engineering and land surveying may not constitute the actual and visible beginning of improvement for purposes of establishing the priority of mechanics' liens. Minn.Stat. § 514.05, subd. 2 (1987). If the 1987 amendment applies retroactively MWF contends that the staking at issue cannot establish priority as a matter of law and thus the motions for partial summary judgment on the priority of the mechanics' liens made by Weis Builders and the mechanics' lien coordinator must be denied.

Weis Builders contends, however, that the 1987 amendment does not apply retroactively and that under the provisions of the 1974 amendment any visible staking, whether or not fundamental to the actual construction, is sufficient to establish mechanics' lien priority.[10] It contends that Sunde's staking was visible as a matter of law and thus its motion for partial summary judgment should be granted.[11]

### 3. The Mechanics' Lien Coordinator's Motion For Partial Summary Judgment Regarding the Sign Posted By MWF

Under Minnesota law a mechanic's lien attaches when the first item of material or labor is furnished for the beginning of the improvement and the lien has priority over a mortgage not yet recorded unless the lienholder has actual notice of the mortgage. It is undisputed that actual and visible improvements began at the Ford Mall site prior to the recording of the mortgage in July 1987. The mechanics' lien claimants thus argue that the liens are clearly prior to the MWF mortgage unless the actual notice exception applies. For purposes of this motion, the mechanics' lien coordinator is willing to stipulate that MWF installed a sign on the Ford Mall premises on January 29, 1987. It is undisputed that the sign stated: "Financing By MWF Mortgage Corporation." The mechanics' lien coordinator is further willing to stipulate that the sign was in fact seen by the lien claimants who were working at the Ford Mall site during the period of time prior to the mortgage recording in July 1987. The mechanics' lien coordinator argues, however, that this sign still does not constitute actual notice under Minnesota law and the mechanics' lien claimants are thus entitled to summary judgment.

The mechanics' lien coordinator also contends that Weis Builders' alleged knowledge of MWF's mortgage should not be imputed to the other mechanics' lien claimants. The mechanics' lien coordinator argues that in Minnesota liens of subcontractors and suppliers are not deemed to be derivative and that there is no basis for imputing Weis Builders' knowledge to any of the other lienholders.[12]

Weis Builders also argues that any knowledge it possessed regarding MWF's mortgage is not imputable to the mechanics' lien claimants. Weis Builders first contends that the Minnesota statute requires actual knowledge and that actual knowledge may not be imputed. Weis Builders also claims that even if a subcontractor is charged with knowledge of the terms of a general contract, this doctrine of imputed knowledge should not be extended to cover actual notice of a mortgage. Weis Builders also disputes MWF's claim that because all mechanics' liens are coordinate (meaning that they all attached at the time of the first visible improvement) that their coordinate nature thereby permits imputation of actual knowledge of a mortgage.

Weis Builders further disputes MWF's contention that Weis Builders had actual knowledge of the mortgage. Weis Builders

---

10. The mechanics' lien coordinator also disputes MWF's contention that the 1987 amendment to the Minnesota priority statute may apply retroactively.

11. In addition to visible staking, the Minnesota statute prior to the 1987 amendment also required that the value of the surveying exceed $250. Weis Builders notes that the value of the services provided in the present case was approximately $6,300.

12. Intervenor Spancrete Midwest Company also submitted papers arguing that Weis Builders' actual knowledge of the mortgage should not be imputed to Spancrete. Spancrete argues that imputing such knowledge runs contrary to the tradition of Minnesota courts to protect mechanics' lienholders. Spancrete further argues that even if the terms and provisions of a principal contract are imputed to subcontractors, there is no reason to expand that principle to impute all of Weis Builders' knowledge to its subcontractors.

argues that the general contract between itself and FMALP is silent concerning the source of financing for the Ford Mall project. Thus, Weis Builders contends that the general contract provided no notice that MWF would be the mortgagee. Moreover, Weis Builders contends that the mortgage had not been executed at the time it entered into the general contract and thus the mortgage could not provide notice of MWF's interests.

MWF contends, however, that its mortgage may be prior to the mechanics' liens because actual notice may have been provided by the sign posted on the Ford Mall property. MWF argues that this sign was large and obvious and stated that financing was provided by MWF. MWF argues that for purposes of the Minnesota statute actual notice may be proven by circumstantial evidence. It is undisputed that MWF posted a sign in January 1987. Thus the issue of whether one or more lien claimant acquired actual notice by virtue of the sign remains a question of fact. MWF thus argues that summary judgment is inappropriate on this issue.

MWF also argues that Weis Builders, as the general contractor, had actual written notice that MWF's mortgage had been executed. Joseph Weis, one of the borrowers, also owned and operated Weis Builders at the time the mortgage was executed. As a party to the mortgage, MWF contends that he necessarily had actual notice of the mortgage. Moreover, as general contractor, Weis Builders was party to a document entitled "Assignment of General Contract and Subcontracts," which was signed on December 29, 1986. That document expressly notified Weis Builders that the mortgage had been executed. MWF thus argues that Weis Builders had actual notice of the mortgage.

MWF further argues that Weis Builders' actual knowledge should be imputed to all other subcontractors (including all mechanics' lienholders). MWF reasons that because a subcontractor is legally charged with notice of the provisions of a principal contract, the subcontractors should also be legally charged with the general contractor's knowledge that a mortgage had been executed. Moreover, MWF argues that the rights of a subcontrac-

tor are largely co-extensive with the rights of the general contractor. It thus contends that if a general contractor has actual notice of a mortgage then all subcontractors also must be deemed to have such notice. As a result of the imputed knowledge, MWF argues that all of the subcontractor's liens are subordinate to MWF's mortgage and summary judgment is also inappropriate on this basis.

### 4. *MWF's Motion For Entry of Judgment Against Milton J. Cohen*

MWF moves for entry of judgment against Milton Cohen pursuant to his obligation under the loan documents. MWF argues that no factual dispute exists regarding the terms of the loan documents and that under the terms of the guaranty Cohen is personally liable for the amounts due pursuant to the terms of FMALP's note and mortgage. There also is no factual dispute regarding the amounts which are currently due. Under the terms of the note, principal is due in the amount of $6,558,171.25, plus interest through August 6, 1990 in the amount of $1,375,710.25, plus interest accruing from August 6, 1990 through the date of entry of judgment, plus costs, attorneys' fees and disbursements. It is also undisputed that FMALP is in default on its obligations pursuant to the loan documents. Thus, MWF seeks an order holding Cohen liable according to the terms of his guaranty.

In response, Cohen argues that his obligations under the loan documents were contingent on MWF's oral promise to increase or continue funding of the construction loan. Cohen contends that in the summer of 1988, MWF agreed to modify the construction loan agreement by increasing the project funding by $700,000. Cohen alleges the existence of "understandings" and "agreements" outside the loan documents which precluded MWF from recovering on any of its claims against him. MWF seeks to dismiss Cohen's defenses, however, arguing that any alleged oral agreements are barred by the *D'Oench, Duhme* Doctrine.

### 5. *MWF's Motion for Entry of Judgment Against FMALP and Joseph Weis*

When MWF began its foreclosure action, FMALP, Weis and Cohen immediately de-

fended by raising counterclaims based on alleged oral agreements between MWF and FMALP. FMALP and Weis claimed that MWF agreed to modify the construction loan agreement by increasing funding by $700,-000, and also raised counterclaims for breach of contract and unjust enrichment based upon those purported representations. They further claim that in late 1988, MWF agreed to continue disbursing the remaining loan proceeds.

At the close of discovery in August 1990, FMALP and Weis withdrew all of their defenses and counterclaims. On August 10, 1990 they stipulated to entry of judgment against them on all counts of the complaint. According to the stipulation, FMALP and Weis agreed that MWF is entitled to an entry of judgment pursuant to the terms of the loan documents. The stipulation further entitles MWF to foreclose its mortgage interest and outlines the terms of the foreclosure sale. The parties also stipulated that there was no just reason to delay entry of judgment. MWF thus seeks immediate entry of judgment pursuant to the stipulation of the parties and Federal Rule of Civil Procedure 54(b).

Weis Builders opposes MWF's motion for immediate entry of judgment and foreclosure of the mortgage.[13] Weis Builders argues that under Rule 54(b) there is just reason for delay of the entry of judgment. Weis Builders argues that ordering foreclosure would be improper because the rights of the parties have not been fully adjudicated. The parties dispute the priority of the mortgage and the mechanics' liens asserted against the property. As a result any bidder at a foreclosure sale would be unable to ascertain the status of the title. In addition, the lien claimants would not know whether their mechanics' liens are prior to the mortgage and thus they would not be required to redeem from the foreclosure sale, or are junior to the mort-

gage and therefore would be required to redeem within the statutory redemption period. The lien claimants would have to advance considerable funds at great expense to redeem the property and such redemption may be unnecessary if the lien claims are senior to MWF's mortgage.[14]

The mechanics' lien coordinator also argues that Rule 54(b) precludes entry of judgment because MWF's claim against the Ford Mall property is not separate and distinct from the claims of the mechanics' lienholders. The mechanics' lien coordinator also argues that an order directing foreclosure at this time is contrary to the interest of judicial administration because it might result in piecemeal appeal of the issues involving the respective interests of MWF and the mechanics' lienholders. The mechanics' lien coordinator also claims that MWF's motion is contrary to the equities involved because it would unnecessarily prejudice the lienholders' rights prior to an adjudication of the priority of their claims.

Jesco, Inc. ("Jesco"), one of the lienholders, further argues that MWF's motion for entry of a final judgment and foreclosure should be denied because a foreclosure sale prior to the determination of the priority issue would have a substantial and negative impact on the interest of the mechanics' lienholders. Jesco contends that the lienholders would need to raise more than $6,000,000 to redeem, requiring substantial effort and commitment by the lienholders to organize and coordinate such a redemption. Jesco further contends that uncertainty created by the pending priority issue will make it more difficult to obtain such commitment and organize such effort to redeem the property.[15] In response, MWF argues that its interests will be substantially prejudiced by delaying entry of judgment directing the foreclosure sale. MWF notes that no personal judgment may

**13.** Weis Builders, however, does not object to the entry of personal judgment against FMALP, Weis or Cohen. The mechanics' lien coordinator adopts Weis Builders' objections to MWF's motion to foreclose its mortgage. The mechanics' lien coordinator also does not object to entry of personal judgment against Weis, Cohen or FMALP, only to a judgment directing foreclosure.

**14.** If the court grants MWF's motion for entry of judgment, Weis Builders requests that entry of judgment be stayed pursuant to Federal Rule of Civil Procedure 62(h).

**15.** The mechanics' lien coordinator also adopts this argument on behalf of the other lienholders.

be entered against Weis, Cohen or FMALP prior to a foreclosure. MWF also notes that interest has not been paid since October 1988, and the amounts due are large and liquidated. Thus it argues that any delay is prejudicial to its interests.

Moreover, MWF contends that the only prejudice alleged by the mechanics' lien claimants is the need to determine whether their redemption from the foreclosure sale is necessary. Borrowing from procedures set out in the Minnesota statute regarding foreclosure by advertisement, MWF argues that the lienholders could tender to the sheriff, at any time prior to the expiration of the redemption period, the amounts necessary to redeem the property together with a bond to pay any additional interest which may accrue. Although MWF acknowledges that these procedures do not apply to a foreclosure by action, it is willing to stipulate that any lien claimant may preserve its rights to redeem pending final adjudication of the priority issues by following the procedures set forth in that statute. MWF argues that such a stipulation would minimize any prejudice which the lien claimants may suffer if MWF is permitted to foreclose on its mortgage.

· Weis Builders contends, however, that the procedure proposed by MWF to preserve the lienholders' rights is not appropriate for actions by foreclosure. It argues that the extension of this procedure to a foreclosure by action defeats its purpose: to preserve redemption rights in an entirely extrajudicial proceeding, such as a foreclosure by advertisement, when there has been a claim that the mortgage is fraudulent, void or has been paid or discharged. In the present case, the coordinator argues that the interests of all parties may be adjudicated at one time and thus reliance on procedures designed for extrajudicial proceedings is unnecessary and undesirable.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552. With this standard at hand, the court will consider the various motions.

### 1. *LTIC's Motion for Summary Judgment Against MWF*

#### A. LTIC's Motion for Summary Judgment on MWF's Contract Claim

██ LTIC seeks summary judgment on MWF's claim based on the terms of the title insurance policy. LTIC concedes for purposes of this motion that the mechanics' liens at issue fall within the terms of the policy,

but contends, however, that the liens are excluded under exclusion 3(a) because MWF created or suffered the lien claims by refusing to disburse still available loan proceeds. LTIC further contends that MWF created or suffered the liens because MWF was aware that work continued on the Ford Mall project despite the project's financial trouble and was aware that liens could arise if FMALP and Weis Builders were unsuccessful in their efforts to obtain more financing.[16] MWF contends, however, that FMALP and Weis Builders created the liens because they had the power to prevent the continued work and made a deliberate decision to proceed despite the known financing problems. MWF further contends that LTIC was also aware of the situation and that if such knowledge equates to intentionally creating or suffering the liens then LTIC is at least a co-creator of those liens. Moreover, MWF contends that it did not intentionally create liens which were superior to its own. LTIC dealt entirely with this risk and thus LTIC, not MWF, is the party that knowingly created and chose to encounter the risk of superior liens.

■ Courts generally agree that the "created or suffered" language in such exclusionary clauses requires "intentional misconduct or inequitable dealings by the insured." *See, e.g., Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103, 1108 n. 8 (8th Cir.1980) (citations omitted). Accident or innocent conduct, or even negligence, does not fall within the

meaning of the exclusionary clause. *Id.; Keown v. West Jersey Title & Guar. Co.*, 161 N.J.Super. 19, 390 A.2d 715, 718–19 (App. Div.1978). To come within this exclusion, the defect must have been created by the insured claimant and not by some other force. *Foremost Constr. Co. v. Killam*, 399 S.W.2d 593, 596 (Mo.Ct.App.1966). Whether the clause applies is a question of fact, not law. *First Nat'l Bank v. Fidelity Nat'l Title Ins.*, 572 F.2d 155, 162 (8th Cir.1978) (reversing a summary judgment granted in favor of title insurer pursuant to exclusion 3(a)).

■ Based on the foregoing, there is a material fact dispute regarding MWF's intention to create or suffer the mechanics' liens and thus LTIC's motion for summary judgment on MWF's contract claim is denied.

### B. LTIC's Motion for Summary Judgment on MWF's Negligence Claim

LTIC also seeks summary judgment on MWF's negligence claim. It argues that title insurers have no duties other than those included within the terms of the written agreements. LTIC contends that its only duty was to issue a title policy based on certain agreements between the parties at the time of closing. LTIC claims that it complied with those provisions and that it was not negligent. LTIC further contends that even if it were negligent in the late recording, that the late recording was not the

---

16. LTIC also contends that a lender must be viewed as having intentionally created superior mechanics' liens as a matter of law solely by refusing to disburse all of the funds originally available for the financing, regardless of the parties' intent, the facts and circumstances surrounding default, the terms of the insurance provisions and the governing contracts, relying on *Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103 (8th Cir.1980); *Bankers Trust Co. v. Transamerica Title Ins. Co.*, 594 F.2d 231 (10th Cir. 1979). MWF argues, however, that it was not contractually obliged to advance additional funds after the mortgage was in default. Thus, MWF argues that the cases upon which LTIC relies are inapposite. Moreover, the cases upon which LTIC relies involved situations in which the insurer agreed only to insure the pay-out process and not the priority of the insured's mortgage. The cases also involved situations in which the liens arose prior to default and the lenders still had contractual obligations to advance funds for work and labor supplied prior to default. The

present case is distinguishable because LTIC contracted to insure both the pay-out process and the priority of MWF's mortgage. Moreover, the mechanic's liens at issue arose after borrower default and thus MWF had no contractual obligation to advance funds after that point in time. Thus, LTIC's argument that MWF should be liable as a matter of law because it failed to disburse all of the funds that LTIC contends are "committed loan proceeds" is rejected. Moreover, LTIC plainly assumed as its part of the insurance contract the risk of loss which ultimately occurred. LTIC may not avoid its insurance obligations by arguing that risks known to the insured are thus suffered by the insured and not covered by the title insurance policy. *See American Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780 (6th Cir.1986) (rejecting LTIC's contention that an insured created or suffered liens which arose because a project was underfunded and the insured knew of the risk of underfunding at the time of the loan).

proximate cause of MWF's loss of priority. Thus it argues that it cannot be held liable for the late recording of the mortgage.

■ MWF, however, contends that LTIC had other obligations outside the terms of the written agreements. It contends that LTIC was obligated to both insure and record and that LTIC was not free to handle the task of recording carelessly, regardless of the consequences, because LTIC has a common law duty to exercise the degree of care and prudence normally expected of a person engaged in the title insurance business. *Cf. Gabrielson v. Warnemunde*, 443 N.W.2d 540 (Minn.1989) (holding that insurance agents have a duty to exercise the skill and care which a reasonably prudent person engaged in the insurance business would use under similar circumstances). MWF further contends that LTIC breached the duty of care defined by LTIC's own internal standards which require its agents to record promptly. LTIC concedes that its failure to timely record was "gross negligence" in the words of Scott McCall, LTIC's Vice President of Quality Control, and Jan Alpert, its Senior Vice President of Operations. Other courts also have held that when a title insurance company takes on additional duties and responsibilities in connection with issuing a policy, the insured has a separate action in tort. *See, e.g., Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 654 (Utah 1990); *Brown's Tie & Lumber Co. v. Chicago Title Co.*, 115 Idaho 56, 59, 764 P.2d 423, 426 (1988); *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 562 A.2d 208, 221 (1989). Although no Minnesota decisions are directly on point, the Supreme Court has held insurance agents to the standard of care and skill of a reasonably prudent person engaged in the insurance business. *Gabrielson*, 443 N.W.2d at 543. Based on the foregoing, MWF has a separate cause of action against LTIC in tort.

■ LTIC also argues that its conduct, even if negligent, was not the proximate cause of MWF's loss of actual priority pursuant to the Minnesota priority statute.[17] MWF contends, however, that there is a material fact dispute regarding whether or not the survey staking was the first visible sign of improvement for purposes of priority. MWF further contends that because of LTIC's role in ordering the December 24, 1986 survey, and in light of LTIC's duty to inspect the premises for the first visible signs of improvement, LTIC should be estopped from raising this defense to MWF's claim. "Estoppel depends on the facts of each case and ordinarily presents a question for the jury. Its elements are representations or inducements by the defendant upon which the plaintiff has reasonably relied on to his detriment." *Mutual Serv. Life Ins. Co. v. Galaxy Builders, Inc.*, 435 N.W.2d 136, 140 (Minn.Ct.App.1989) (citations omitted). MWF claims that it was induced by LTIC's accepting and performing duties as a title insurer and that MWF relied on LTIC to properly inspect the property before closing and to refrain from taking any action, including ordering the December 26, 1986 survey, which subordinates the mortgage to MWF's detriment. Because a material fact dispute exists concerning the legal effects of the staking during that fourth survey, and whether the staking was the proximate cause of MWF's harm, LTIC's role in MWF's injury is yet unclear. (*See* infra discussion on motions for summary judgment on priority issue). Thus, LTIC's motion for summary judgment on MWF's negligence claim is denied.

**2. Weis Builders' Motion for Partial Summary Judgment**

■ Weis Builders seeks partial summary judgment on the question of what constitutes the first visible improvement for purposes of determining the priority of its mechanic's lien.[18] Weis Builders, joined by the mechanics' lien coordinator, contends that prior to the execution of MWF's mortgage on December 29, 1986, survey and engineering services had been performed at the Ford Mall site on

---

**17.** As noted previously, LTIC premises this argument solely on the fourth survey conducted on December 24, 1986 at its own request.

**18.** LTIC also seeks partial summary judgment on this issue, although LTIC relies only on the fourth survey.

four occasions. Weis Builders and the mechanics' lien coordinator contend that those surveys constitute the first visible improvements for purposes of the Minnesota mechanic's lien statute, and thus the mechanics' liens have priority over MWF's mortgage. MWF contends, however, that the surveys and staking performed by Sunde do not constitute ·actual and visible improvement for purposes of ·the priority statute. Whether such work constitutes the actual and visible beginning of an improvement is a question of fact. *Kloster–Madsen, Inc. v. Tafi's, Inc.,* 303 Minn. 59, 64, 226 N.W.2d 603, 607 (1975). MWF contends that any staking relied on by the defendants was not visible as a matter of law. MWF first notes that no proof of visibility is offered for the first three surveys relied on by Weis Builders and the mechanics' lien coordinator in their motions for partial summary judgment. MWF further notes that the fourth survey involved the marking of the four boundary corners of the site. The surveyor testified that only two of the corners were marked by wooden stakes while the other two corners were marked by iron monuments that had been pounded flush with the ground, nails and painted X's. MWF contends that two wooden stakes are not sufficient to constitute visible improvement as a matter of law. . The movants contend, however, that the only evidence before the court is that the survey work was visible, based on the testimony of the surveyor, Mark Hanson.[19] Although MWF concedes that Hanson did testify that the work was visible on December 26th, it is undisputed that he did not visit the site after that date. MWF thus contends that there is no evidence that the stakes were visible on the date of closing, December 29th.[20]

MWF further argues that any staking must also be fundamental to the actual construction project to constitute the first visible improvement for purposes of priority. *See, e.g., E.H. Renner & Sons, Inc. v. Sherburne Homes, Inc.,* 458 N.W.2d 177, 179 (Minn.Ct. App.1990) (citing *National Lumber Co. v. Farmer & Son, Inc.,* 251 Minn. 100, 104, 87 N.W.2d 32, 36 (1957), for the proposition that the key inquiry for purposes of the Minnesota priority statute is "whether or not the improvement bears directly on the construction of the· building rather than whether it is part of the overall project involved"). Weis Builders contends, however, that any visible staking, no matter what its purpose, is sufficient to ·constitute the first visible improvement under the Minnesota priority statute, relying on *R.B. Thompson, Jr. Lumber Co. v. Windsor Dev. Corp.,* 383 N.W.2d 362, 367 (Minn.Ct.App.1986).[21]

MWF also contends that the 1987 version of the Minnesota priority statute may apply retroactively. Under the terms of the 1987 amendment visible staking cannot be sufficient to establish priority. Weis Builders contends, however, that the 1987 amendment does not apply retroactively and that under the 1974 amendment any visible staking is sufficient to establish mechanics' lien priority. Neither of these issues needs to be resolved at this point, however, because there is a material fact dispute regarding the visibility of the improvements and thus the

19. Mark Hanson, the surveyor, testified in a deposition that the survey work he performed on December 24, 1986, was visible.

20. MWF also argues that boundary staking alone cannot constitute the first visible improvement as a matter· of law, relying on *Reuben ·E. Johnson Co. v. Phelps,* 279 Minn. 107, 156 N.W.2d 247 (1968). It is unclear whether the *Reuben* case remains good law but this argument further supports the denial of summary judgment on the priority issue.

21. There is a material fact dispute regarding whether the surveys had a direct relationship to the Ford Mall project. Weis Builders contends that some of the surveying work was done for purposes of designing the Ford Mall project and marking the boundaries of the project, and thus the survey bore a direct relationship to the construction of Ford Mall. MWF, however, contends that the first three surveys clearly do not relate directly to the Ford Mall project, because they occurred prior to the time when the project was conceived. MWF further contends that the fourth survey does not relate directly to the Ford Mall project because it was done for financing not development purposes. Because there is a material fact dispute regarding the visibility of the staking, the dispute regarding the relationship between the surveys and the Ford Mall project and whether such a relationship is necessary for purposes of the 1974 amendment need not be resolved at this point.

motions for partial summary judgment on this issue is denied.

### 3. The Mechanics' lien coordinator's Motion for Partial Summary Judgment

The mechanics' lien coordinator moves for partial summary judgment on various issues relating to the priority of the mechanics' liens.[22] MWF's mortgage was executed on December 29, 1986. It is undisputed that MWF installed a sign on the Ford Mall site on January 29, 1987. The mechanics' lien coordinator is willing to stipulate that the sign was in fact seen by the lien claimants who were working at the Ford Mall site during the time prior to the recording of the mortgage in July 1987. It is also undisputed that actual and visible improvements began at the Ford Mall site prior to the mortgage recording. The mechanics' lien coordinator argues that the liens clearly had priority over the MWF mortgage unless the actual notice exception of the Minnesota priority statute applies. The exception is stated in Minn.Stat. § 514.05, subd. 1, which provides:

> All liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof.

MWF contends that there exists a genuine issue of material fact regarding whether the lien claimants had actual notice of MWF's interests as a result of the sign installed on January 29, 1987. MWF contends that its sign was large, obvious and stated "Financing by MWF Mortgage Corporation." The mechanics' lien coordinator, however, argues that this sign cannot, as a matter of law, provide actual notice under the statute. The mechanics' lien coordinator, however, cites no case to support this proposition.[23] The coordinator relies on *Jadwin v. Kasal,* 318 N.W.2d 844 (Minn.1982), but *Jadwin* is distinguishable from the present case because no mortgage existed in *Jadwin* at the time when the mechanic's lien arose; the parties were merely negotiating financing at that time. *Id.* at 849. Moreover, the *Jadwin* court made no attempt to define actual notice for priority purposes but merely held that "since no mortgage interest existed at the time [the] mechanics' lien attached in July 1978, we hold that [the] lien takes priority over the bank's mortgage." *Id.* In the present case, however, MWF's mortgage interest was in existence when the mechanics' liens attached, and there is a material fact dispute regarding whether the lien claimants received actual notice of the mortgage.

Based on the foregoing, there is a material fact dispute regarding whether the mechanics' lien claimants had actual notice of the MWF mortgage, and thus the mechanics' lien coordinator's motion for partial summary judgment is denied.[24]

---

**22.** The mechanics' lien coordinator joined Weis Builders' motion for partial summary judgment regarding the first visible sign of improvement for purposes of priority, *see* supra discussion of Weis Builders' motion.

**23.** Moreover, actual notice may be proven by circumstantial evidence. *See, e.g., Anderson v. Iverson Outdoor Life,* 187 Minn. 308, 309–10, 245 N.W. 365, 366 (1932). The *Anderson* court dealt directly with the issue of whether a mechanics' lien claimant knew of the existence of a mortgage before it was recorded and held that there was sufficient evidence, although circumstantial, to sustain an inference that the lienholder had actual notice as contemplated by the statute. *Id.*

**24.** MWF also argues that Weis Builders had actual knowledge of its mortgage interest and this knowledge should be imputed to the lien claim-

ants. Weis Builders denies that it had actual notice of the mortgage but argues that even if it did have actual knowledge such knowledge should not be imputed to the lienholders. The mechanics' lien coordinator also raises this argument in its motion for partial summary judgment. Intervener Spancrete Midwest Company also submitted papers arguing that Weis Builders' actual knowledge of the mortgage should not be imputed to Spancrete. Thus there is a material fact dispute regarding whether or not Weis Builders had actual knowledge of the mortgage. There also exists a material fact dispute regarding the existence of the lienholder's actual knowledge through the MWF sign. Thus summary judgment is not appropriate on the issue of whether or not Weis Builders' actual knowledge may be imputed to the lienholders.

844

### 4. *MWF's Motion for Entry of Judgment Against Milton Cohen, FMALP and Joseph Weis*

█ MWF moves for entry of judgment against FMALP and Joseph Weis pursuant to the terms of those parties' stipulation. MWF further moves for summary judgment against Milton Cohen and seeks to dismiss Cohen's defenses to this motion, arguing that they are barred by the *D'Oench, Duhme* doctrine. Weis Builders opposes MWF's motion to seek immediate entry of judgment and foreclosure of the mortgage, and the mechanics' lien coordinator adopts Weis Builders' objections.[25] MWF argues that its interests will be substantially prejudiced by delaying entry of judgment directing a foreclosure sale. MWF emphasizes that no interest has been paid since October 1988 and that the amounts owed to it are both liquidated and large. Thus it argues that any delay in entry of judgment is certainly prejudicial.

Weis Builders, however, argues that pursuant to Federal Rule of Civil Procedure 54(d) there is just reason for delay in entry of the judgment because the priority issue is not yet resolved and any bidder at a foreclosure sale would be unable to determine the status of the title of the property. Moreover, the lien claimants will not know whether their mechanics' liens have priority over the mortgage thus requiring no redemption, or are junior to the mortgage in which case they would be required to redeem the property within the statutory redemption period. They contend that redemption of the property will require the lien claimants to advance considerable funds at great expense and that such redemption may be unnecessary if the

lien claims prove senior to MWF's mortgage.[26] Jesco, Inc. one of the lienholders, further notes that in order to redeem, the lienholders would need to raise more than six million dollars, which would require a substantial undertaking and commitment by the lienholders and that the uncertainty created by the pending priority issue will only make it more difficult to organize such an effort and obtain such a commitment.[27]

Because of the uncertainty of the priority issue, the court deems that there is just reason to delay entry of judgment pursuant to Federal Rule of Civil Procedure 54(b) and thus MWF's motion for entry of judgment against Joseph Weis, Milton Cohen and FMALP is denied.[28]

MWF also seeks to dismiss Milton Cohen's defenses. Cohen argues that his obligations under the loan documents were contingent upon MWF's oral promise to increase or continue funding of the loan. Cohen contends that in the summer of 1988, MWF agreed to modify the construction loan agreement by increasing project funding by $700,000. Cohen thus alleges the existence of understandings and agreements outside the loan documents which would operate to preclude MWF from recovering on any of its claims against him.

█ Federal law, however, estops Cohen from raising any defenses based upon purported oral representations by MWF. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942). Pursuant to this doctrine, a party may not assert claims or defenses based on (1) an oral agreement, (2) which is not reflected in banking records, and (3) which

---

**25.** Neither Weis Builders nor the mechanics' lien coordinator object to entry of personal judgment against Weis, Cohen or FMALP, only to entry of a judgment directing foreclosure. Jesco, Inc., one of the lienholders also opposes this motion. As MWF notes, however, no personal judgment may be entered against Weis, Cohen or FMALP prior to a foreclosure on the Ford Mall project.

**26.** The mechanics' lien coordinator also adopts Weis Builders' objections.

**27.** The mechanics' lien coordinator also adopts this argument on behalf of the other lienholders.

**28.** MWF suggests that the lienholders could tender to the sheriff, at any time prior to the expiration of the redemption period, the amount necessary to redeem the property together with a bond to pay any additional interest that may accrue. This procedure, however, does not eliminate the concern that the lienholders may be forced to redeem when such redemption may prove unnecessary.

tends to diminish the assets found in the banking records. When a representation is a condition precedent to the performance of a contract, it is deemed an agreement precluded by *D'Oench, Duhme. W.T. Langley v. FDIC*, 484 U.S. 86, 93, 96, 108 S.Ct. 396, 402, 403, 98 L.Ed.2d 340 (1987). Cohen contends that his obligations under the loan documents are contingent on MWF's oral promise to increase or continue funding of the loan. Thus, Cohen's defenses allege an agreement within the *D'Oench, Duhme* doctrine and the doctrine bars his defenses. Thus, MWF's motion to dismiss his defenses is granted.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. LTIC's motion for summary against MWF is denied;

2. Weis Builders' motion for partial summary judgment on the issue of the first visible improvement to the Ford Mall project is denied;

3. The mechanics' lien coordinator's motion for partial summary judgment on the issue of actual notice is denied;

4. MWF's motion for entry of judgment against FMALP, Joseph Weis and Milton Cohen is denied; and

5. MWF's motion to strike Cohen's defenses is granted.